NOT DESIGNATED FOR PUBLICATION

No. 119,844

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DARNELL L. SHIELDS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; STEPHEN J. TERNES, judge. Opinion filed February 7, 2020. Affirmed.

*Kristen B. Patty*, of Wichita, for appellant.

*Boyd K. Isherwood*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., HILL and GARDNER, JJ.

PER CURIAM: Darnell Shields appeals his convictions for violation of a protective order and intimidation of a witness or victim, claiming the evidence was insufficient to support the jury verdicts. We disagree and affirm.

1

*R.E. is granted a protection order against Shields, then reports Shields beat her up.*

Shields and R.E. were dating. On September 22, 2016, the district court granted R.E. a protection from abuse order against Shields. The order prohibited Shields from contacting R.E. directly or indirectly. Both Shields and R.E. were present in court when the order was granted. The order was effective for one year. The order plainly stated, "ONLY THE COURT CAN CHANGE THIS ORDER."

Then, on June 25, 2017, R.E. called police and reported that Shields had beaten her up. She called back 30 to 45 minutes later and recanted her accusation. But the police arrested Shields a few days later, anyway.

Between June 30, 2017, and July 2, 2017, Shields called R.E. numerous times from jail. They had nine phone conversations that were recorded. During that period, the protection order prohibiting Shields from contacting R.E. was still in effect.

Accordingly, the State charged Shields with nine counts of violation of a protective order, a class A person misdemeanor, and one count of intimidation of a witness or victim, a class B person misdemeanor.

*Nine jail calls from Shields to R.E. are played for the jury.*

At trial, the jurors heard two-and-a-half hours of recordings of phone conversations between Shields and R.E. During the calls, Shields tried to conceal R.E.'s identity. He referred to her in the third person. Shields refused to call R.E. on her phone. During one call, R.E. did not understand that Shields was attempting to hide her identity. Shields accidentally called her by her real name and then called her by another name to try to cover it up. R.E. got upset when he called her by another woman's name. Shields told her he was trying to "clean this shit up" because he had slipped up by using her real

2

name. Shields then angrily said her full name. Shields then yelled at R.E. for the rest of the call, repeatedly calling her a "bitch." Shields said that R.E. needed "training."

On other calls, R.E. attempted to hide her own identity. During one call, R.E. referred to Shields as her brother. During another call, R.E. mentioned dying her hair blonde so she could visit Shields in jail. A sheriff's deputy familiar with R.E.'s voice testified that R.E. was the woman on all of the calls.

During many of the phone calls, Shields directed R.E. to go to the prosecutor's office and demand that it drop the charge against him. He told her to tell the prosecutor that it was not him who beat her up. He also directed her to call his probation officer. Shields blamed R.E. for him being in jail. He expected her to fix the situation.

Shields berated R.E. for sending him letters and pictures rather than pushing to get him out of jail. He assumed the pictures meant she thought he would be in jail for a while and wanted to know if she was cooperating with the prosecutor. He stated several times that he was irritated and she was "pissing [him] off" because she could not get him out of jail. He told her to keep the police out of their business. He threatened to kick her out of his mother's house. He also demanded that she do his homework while he was in jail.

During several calls, Shields reminded R.E. to tell his mother to tell Tyree "the story" if he found out Shields was in jail. During one call, R.E. indicated that she was worried because the police had taken pictures of her and she thought there might be a recording of her statement to the police.

*R.E. testifies in support of Shields.*

R.E. testified at the trial. She admitted to having a series of phone conversations with Shields while he was in jail. She admitted that she attempted to hide her identity on

3

the jail calls, but claimed it was because she was under a no contact order due to her probation. She was not sure when that no contact order went into effect, but she knew it was not in effect when Shields was arrested.

R.E. stated that her allegation to police that Shields had beaten her up was false. She testified that Shields neither intimidated nor forced her to go to the prosecutor's office.

R.E. testified that in March 2017, she had tried to drop the protection order prohibiting Shields from contacting her. She testified she went to the courthouse and signed some paperwork. She admitted she did not have a court hearing to lift the order and she did not receive any documentation from the court saying that the order had been lifted. She said she told Shields and his mother that the protection order had been lifted. Shields picked her up from the courthouse afterward. She said she later moved in with Shields and his mother.

Shields' mother testified that R.E. told her the protection order had been dropped, but she was unsure of the time frame that had occurred. She testified R.E. had been living with her for "awhile," and it "seemed like forever."

The jury found Shields guilty of intimidation of a witness or victim and guilty of all but one count of violation of a protective order. The court sentenced Shields to an 18-month jail sentence.

*There was sufficient evidence that Shields knew he was violating the protection order.*

Shields contends there was insufficient evidence that he knowingly violated the protection from abuse order because R.E. deceived him about the continued existence of the order.

When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018). A verdict may be supported by circumstantial evidence, if such evidence provides a basis for a reasonable inference by the fact-finder regarding the fact in issue. Circumstantial evidence, in order to be sufficient, need not exclude every other reasonable conclusion. A conviction of even the gravest offense can be based entirely on circumstantial evidence. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016). The defendant's state of mind is typically proven by circumstantial evidence. *State v. Thach*, 305 Kan. 72, 82-84, 378 P.3d 522 (2016).

The State had to prove Shields "knowingly" violated a protection from abuse order. See K.S.A. 2016 Supp. 21-5924(a)(1). A person acts knowingly "when such person is aware of the nature of such person's conduct or that the circumstances exist." K.S.A. 2016 Supp. 21-5202(i). Knowledge of the protective order is required. *State v. Hunter*, No. 113,865, 2017 WL 383384, at *3 (Kan. App. 2017) (unpublished opinion).

While R.E. testified that she told Shields the protection order had been lifted, the jury was free to disbelieve her testimony. On appeal, we cannot redetermine the credibility of witnesses or reweigh the evidence. See *Chandler*, 307 Kan. at 668. Shields was present at the hearing when the court granted the protection order. The protection order clearly stated that it could only be lifted by the court. Shields actively attempted to conceal R.E.'s identity on the jail calls. He twice refused to call her on her phone. He referred to her in the third person. When he accidentally called her by her real name, they had an explicit conversation about the fact that he had been attempting to hide her identity. It was apparent from these calls that Shields knew he was not supposed to be talking to R.E. The jurors could have disbelieved R.E.'s explanation that she was under a

no contact order at that time. Rather, the jurors could have reasonably inferred that Shields was attempting to conceal R.E.'s identity because he knew the protection order prohibiting him from contacting R.E. was in effect. In the light most favorable to the prosecution, there was sufficient evidence for the jurors to find beyond a reasonable doubt that Shields knowingly violated the order.

*There was sufficient evidence to support the intimidation conviction.*

Shields also contends that there was insufficient evidence to support a conviction for intimidation of a witness or victim because there was no evidence to dispute R.E.'s testimony that he did not intimidate or force her into dropping a valid complaint. He claims that she was trying to correct a false report. He cites no authority supporting his argument.

The State had to prove that Shields prevented or dissuaded, or attempted to prevent or dissuade, R.E. from causing a complaint, indictment, or information to be sought and prosecuted, or caused a violation of probation to be reported and prosecuted, and assisted in its prosecution. The State also had to prove Shields' intent was to vex, annoy, harm, or injure R.E., or to thwart or interfere with the orderly administration of justice. See K.S.A. 2016 Supp. 21-5909(a)(2)(B). The test to determine the reaction of a victim in an intimidation case is *objective, not subjective*—i.e., that of a reasonable person. *State v. Wilkins*, 305 Kan. 3, 13, 378 P.3d 1082 (2016).

At trial, R.E. testified that she was attempting to correct a false report. If the report was false, then there was nothing to prosecute. But the jury did not have to find her testimony credible. Again, we cannot redetermine credibility or reweigh evidence. See *Chandler*, 307 Kan. at 668. The jail calls tended to dispute R.E.'s testimony. The jurors heard two-and-a-half hours of conversations between Shields and R.E. On one of the calls, R.E. told Shields she was worried because the police had taken pictures of her and

6

may have recorded her statement when she reported that he had beaten her up. Throughout the calls, Shields directed R.E. to go to the prosecutor and demand that the charges be dropped. He often berated her for not getting him out of jail. He instructed her to tell "the story." He inquired whether she was "cooperating" with the prosecutor. He told her that she needed to be "trained" and to keep the police out of their business. He threatened to kick her out of his mother's house.

Viewing the evidence in the light most favorable to the prosecution, a rational jury could have found Shields guilty of intimidation of a witness or victim and violation of a protective order.

Affirmed.